1

**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
2   SETH A. SAFIER (State Bar No. 197427)
TODD KENNEDY (State Bar No. 250267)
3   100 Pine Street, Suite 1250
San Francisco, California 94111
4   Telephone: (415) 336-6545
Facsimile:  (415) 449-6469
5

6   Attorneys for Plaintiff

7                        UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNA

9                        SAN FRANCISCO DIVISION

10

11   | LOUIS HICKS, an individual, on behalf of himself, the | CASE NO. 5:19-cv-02050-WHA |
12   general public, and those similarly situated,

13              Plaintiff,                              **DECLARATION OF**
                                                        **SETH A. SAFIER IN**
14                                                      **SUPPORT OF**
                      v.                                **PLAINTIFF'S MOTION**
15                                                      **TO REMAND ACTION**
                                                        **TO STATE COURT**
16   HP, INC.,
                                                        Date: June 13, 2019
17              Defendant.                              Time: 8:00 am
                                                        Courtroom: 12 - 19th Floor
18                                                      Judge:  Hon. William H. Alsup
19
                                                        **[REDACTED]**
20

21

22

23

24

25

26

27

28

I, Seth A. Safier, declare as follows:

1.      I am a member of this Court and attorney of record for Plaintiff Louis Hicks in this action.  I make this declaration of my own personal knowledge and could testify competently to the facts stated herein.

2.      Attached hereto as Exhibit A is a true and correct copy of a letter I had mailed to HP, Inc.

3.      Attached hereto as Exhibit B is a true and correct copy of a draft settlement agreement under the provisions of the CLRA that I sent to Hunter Eley, HP's counsel, via email, on May 8, 2018. Also included with Exhibit B is a copy of that email.

4.      Attached hereto as Exhibit C is a true and correct copy of a draft settlement term sheet, including a classwide release, that I emailed to Mr. Eley on March 18, 2019. Also attached is a copy of that email.

5.      Attached hereto as Exhibit D is a true and correct copy of a letter that I emailed Mr. Eley on April 19, 2019, three days after HP filed its notice of removal. Also included with Exhibit D is a copy of that email.

6.      Attached hereto as Exhibit E is a true and correct copy of Mr. Eley's email response to my April 19 letter. HP declined to provide any evidence of diversity of citizenship or any support for its contention that it had only recently learned of the $12 per class member amount in controversy.

7.      Attached hereto as Exhibit F is a true and correct copy of excerpts from the March 13, 2019 deposition of Garish Nair, HP's person most knowledgeable regarding, *inter alia*, the type of contact information HP maintains for its customers.

8.      Having conducted online research, and discussed the issue with Mr. Eley, I am currently unaware of any other class action that has been filed asserting the same or similar factual allegations against any HP on behalf of the same or other persons.

9.      HP's removal followed directly from the recent finalization of the class certification schedule by Judge Walsh and Plaintiff's completion of virtually all class certification related discovery.

10.     Plaintiff has expended in excess of 26.5 hours amount of time drafting, editing and filing this motion to remand, declarations, and the letter to Defendant. This time includes time spent working with the expert, Dr. Gobalet. Specifically, I have spent a total of 22 hours, and my partner Adam Gutride has spent 4.5 hours, working on this motion and supporting documentation. We both bill $1025 per hour.[1] Plaintiff has also incurred costs, including $5,100 in expert fees and approximately $75 in service costs. I anticipate that this firm will collectively expend another approximately 7 hours reading Defendant's opposition and drafting a reply, and another 2.5 hours preparing for, traveling to, and attending a hearing on this matter. I accordingly anticipate additional attorneys' fees of $9,737.50. On the basis of the foregoing, Plaintiff requests $36,900 in fees and $5,175.00 in costs.

This declaration was executed this 8th day of May, 2019, at San Francisco, California. I state the foregoing under penalty of perjury under the laws of the United States.

Dated:  May 8, 2019

_____
Seth A. Safier, Esq.

---

[1] These rates are our 2019 rates. Mr. Gutride is a 1994 graduate of Yale Law School. I am a 1998 graduate of Harvard Law School. Our respective hourly rates have been court approved, including recently in the following cases: On March 10, 2019, by Judge Nathanael Cousins in *Jackie Fitzhenry-Russell et al v. Keurig Dr Pepper Inc., et al*, 5:17-cv-00564-NC. Judge Cousins approved an hourly rate of $894 for Adam and me. In that case, we agreed to use the *Laffey* matrix for fees. Judge Richard Seeborg, in *Pettit v. Procter & Gamble Company*, Case No. 3:15-cv-02150-RS, approved 2018 hourly rates of $975 and $950, respectively for Adam and me. On August 29, 2018, Judge Richard Seeborg in *Koller et al. v. Med Foods, Inc*., et al., Case No. 3:14-CV-2400-RS approved GSLLP's regular 2018 billing rates of $975 for Adam and $950 for me. On March 16, 2018, Judge Winifred Smith of the Alameda County Superior Court approved GSLLP's regular 2017 billing rates of $950 for Adam, and $925 for me in *Kumar v. Safeway, Inc*., Case No. RG 14726707. These 2017 rates were also approved on July 7, 2017 by Judge Gonzales Rogers in *Kumar v. Salov North America Corp*., Case No. 14-cv-2411 (N.D.Cal.). On December 5, 2017, Judge Claudia Wilken approved GSLLP's 2017 rates in *Rainbow Business Solutions v. MBF Leasing*, Case No. 10-cv-1993 (N.D.Cal.).

# EXHIBIT A

October 10, 2017

**VIA CERTIFIED MAIL;**
**RETURN RECEIPT REQUESTED**

HP Inc.
c/o The Corporation Trust Company, registered agent
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

   **Re:**  <u>On-Going Violations of the California Consumers Legal Remedies Act</u>

Dear Sirs:

  I write on behalf of my client, Louis Hicks, and the proposed class of similarly situated persons he seeks to represent, to advise you that Defendant HP Inc. has violated and continues to violate California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*; False Advertising Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and the Consumers Legal Remedies Act (the "CLRA"), Cal. Civil Code §§1750 *et seq.* I ask that Defendant remedy such violation(s) within thirty (30) days.

  Defendant is engaging in unfair competition and unfair or deceptive acts or practices with regard by advertising, marketing, and selling certain laptop computers as including Universal Serial Bus ("USB") 3.1 "Gen 1" ports (hereinafter referred to as the "Purported USB 3.1 Laptops.") HP specifically marketed, advertised and represented to consumers that the USB ports of the Purported USB 3.1 Laptops were capable of transferring data at rates of 5 gigabits (Gb) per second, which it denoted as "5Gb/s." (In some of the laptops, HP compounded the misrepresentation by using the abbreviation GB which means gigabytes instead of gigabits.)

  The claimed transfer speed was false. The USB ports are incapable of transferring data at anywhere near the speeds advertised. Rather, the USB ports are capable of transferring data at rates ranging from approximately 665 megabits/second (equal to 0.65 Gb/s) up to 1,231 megabits/second (equal to 1.2 Gb/s). These rates are only 13.3% to 24.6% as fast as the 5 Gb/s rate advertised by HP (and only 1.7% to 3.1% as fast as the 5 GB/s rate).

October 10, 2017
Page 2

In fact, the USB ports on the Purported USB 3.1 Laptops are not really USB 3.1 ports. The USB 3.1 specification, developed by HP in collaboration with five other technology companies, states that Gen 1 USB 3.1 hosts must be capable of transferring data at an "Enhanced SuperSpeed" rate of 5 gigabits/second. As stated above, the USB ports of the Purported USB 3.1 Laptops—even when operating at their highest speeds—only transfer data at approximately 24.6% of the required 5 gigabits/second rate.

These activities violate California Civil Code section 1770(a), in particular by:

- misrepresenting the approval or certification of goods;

- misrepresenting the certification by another;

- using deceptive representations in connection with goods;

- representing that goods have approval, characteristics, uses, benefits, and qualities that they do not have;

- making improper representations that the goods and/or services it sells are of a particular standard, quality, or grade, when they are of another; and

- advertising goods with intent not to sell them as advertised.

You are likely aware that my client has filed a class action complaint against Defendant concerning these practices. My client will amend the complaint to seek monetary relief unless, within thirty (30) days, Defendant does the following:

- identifies all consumers similarly situated to my client or makes reasonable efforts to identify such consumers;

- notifies all consumers so identified that upon their request, Defendant will refund the price premium they paid (i.e., the difference between the price consumers paid for the Purported USB Laptops and the price they would have paid but for Defendant's misrepresentations);

- gives any such requested remedy to the consumers within in a reasonable amount of time; and

- immediately ceases from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, then ceases from engaging within a reasonable time in the above-complained of methods, act, or practices.

October 10, 2017
Page 3

If Defendant fails to comply with this request within thirty (30) days, Defendant may be liable for the following monetary amounts under the Consumers Legal Remedies Act:

- Actual damages suffered;

- Punitive damages;

- Costs and attorney's fees related to suit; and

- Penalties of up to $5,000.00 for each incident where senior citizens have suffered substantial physical, emotional or economic damage resulting from Defendant's conduct.

I hope, however, that Defendant will choose to correct these unlawful practices promptly. A failure to act within thirty (30) days will be considered to be a denial of this claim and my client will act accordingly.

If you would like to discuss the matter, please do not hesitate to call me at 415-336-6545. Otherwise, we look forward to Defendant immediately changing its practices and compensating the above-identified individuals.

Sincerely yours,

Seth A. Safier, Esq.

# Exhibit B

REDACTED

# Exhibit C

REDACTED

# Exhibit D



Attorneys at Law

Seth Safier <seth@gutridesafier.com>

---

## Re: Louis Hicks v. HP Inc.; Case No. 17CV317178 (Letter re Remand)

**Seth Safier** <seth@gutridesafier.com>                                                    Fri, Apr 19, 2019 at 12:35 PM
To: Hunter Eley <heley@dollamir.com>
Cc: Adam Gutride <adam@gutridesafier.com>, "todd@gutridesafier.com" <todd@gutridesafier.com>, "hpusb@gutridesafier.com" <hpusb@gutridesafier.com>, Gregory
Doll <gdoll@dollamir.com>, Connie Tcheng <ctcheng@dollamir.com>, Lloyd Vu <lvu@dollamir.com>, Courtney McCabe <cmccabe@dollamir.com>, Genevieve Fenster
<gfenster@dollamir.com>

   Hunter,
   Please see the attached. VTY,

   --
   Seth Safier
   Gutride Safier LLP
   100 Pine Street, Suite 1250
   San Francisco, CA 94111
   Telephone: (415) 336-6545
   Facsimile: (415) 449-6469
   www.gutridesafier.com

---

📄 **Letter re remand HP FINAL.pdf**
116K

GUTRIDE SAFIER LLP   Attorneys at Law

April 19, 2019

**VIA ELECTRONIC MAIL**
Hunter Eley, Esq.
Doll Amir Eley LLP
1888 Century Park East, Suite 1850
Los Angeles, CA 90067
heley@dollamir.com

     Re:    *Hicks v. HP Inc.,* Case 5:19-cv-02050-SVK

Dear Hunter:

     I write to demand that Defendant HP, Inc. stipulate to remand this case, as it has not demonstrated that the parties are minimally diverse. Even if it could so, its removal is untimely and subject to the home state and local controversy exceptions to CAFA.

     "[U]nder CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction." *Abrego Abrego v. The Dow Chemical Co*., 443 F.3d 676, 685 (9th Cir. 2006); *see also Serrano v. 180 Connect, Inc.*, 473 F.3d 1018, 1024 (9th Cir. 2007) (proponent of federal jurisdiction bears burden of proving jurisdiction); *accord Morgan v. Gay*, 471 F.3d 469, 472-73 (3d Cir. 2006) (under CAFA, party seeking removal bears burden of establishing requisite amount in controversy); *Miedema v. Maytag Corp*., 450 F.3d 1322, 1328-29 (11th Cir. 2006) (CAFA does not alter traditional rule that proponent of federal jurisdiction bears burden of proving amount in controversy); *Brill v. Countrywide Home Loans, Inc*., 427 F.3d 446, 448 (7th Cir. 2005) ("none [of CAFA's language] is even arguably relevant" to question of burden shifting). All doubts and ambiguities are resolved against removal and in favor of remand. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108 (1941).

     In its removal petition, HP argues, without any evidentiary support, that (i) it discovered, on March 18, 2019, the value of Plaintiff's claims exceed $5,000,000 and (ii) on April 11, 2019, it learned that at least two class members are not citizens of California or Delaware. Even if true, both claims are untimely as the amount in controversy was previously known, at that latest, in May of 2018, and HP knew (or should have known) of non-California/Delaware citizens in the putative class as of the filing of the initial complaint in October of 2017. Moreover, even if HP had recently discovered such persons, it is still required to offer competent evidence to support this claim and/or explain why its recent discovery was in good faith. HP does neither; instead, Defendant simply asserts its conclusions without even a supporting declaration.

**<u>HP Has Known That the Amount In Controversy Requirement Is Satisfied For Close to a Year.</u>**

     Regarding the amount in controversy, HP asserts that my letter of March 18, 2019, for the first time, disclosed "a specific dollar amount that represents the settlement value of the

Hunter Eley, Esq., *et al.*
April 19, 2019
Page 3

purchases. It is true that, for purposes of diversity, "residency" is not synonymous with "citizenship." However, under California law, unless proved otherwise by HP, the place where a person lives is presumptive evidence of their domicile. *See, e.g., NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016) ("[T]he place where a person lives is taken to be his domicile until facts adduced establish the contrary.") (*citing Anderson v. Watt*, 138 U.S. 694, 706, 11 S. Ct. 449 (1891). Accordingly, all putative class members are presumptively California citizens for diversity purposes. *See Zavala v. Deutsche Bank Tr. Co. Americas*, No. C 13-1040 LB, 2013 U.S. Dist. LEXIS 96719, 2013 WL 3474760, at *3 (N.D. Cal. July 10, 2013) ("[T]he complaint indicates that [plaintiff] resides in California. A party's residence is 'prima facie' evidence of domicile. In the absence of evidence to the contrary, [plaintiff] is a California citizen for diversity purposes.") Though HP is obligated to establish that more than a third of the putative class, though California residents at the time of the purchase, were domiciled elsewhere, it has not (and cannot) meet this burden because, at a minimum, it defies logic and common sense. *See, e.g., Rodriguez v. Instagram, LLC* (N.D.Cal. July 12, 2013, No. C 12-06482 WHA) 2013 U.S.Dist.LEXIS 98627, at *7 ("This order finds that a consumer class defined as California residents is, by and large, a class of California domiciles and that the aberrated case wherein a California resident is domiciled elsewhere is so rare as to fall far short of the one-third needed to defeat the exception.") As stated by Judge Alsup in *Instagram*: "The idea that at least one-third of all California residents claim a domicile elsewhere is fanciful. This order holds that for a class of consumers residing in California, at least two out of three are also California citizens." *Id.; see also Quesada v. Herb Thyme Farms, Inc.*, No. CV 11-00016 ODW SSX, 2011 U.S. Dist. LEXIS 37697, 2011 WL 1195952, at *4 (C.D. Cal. Mar. 28, 2011) ("Plaintiff defines the class as '[a]ll persons within the state of California who purchased HerbThyme fresh herbs sold as 'Fresh Organic' but which included some portion of conventionally grown herbs' ... Such definition indicates that Plaintiff's proposed class is limited to purchasers within California"); *Rotenberg v. Brain Research Labs LLC*, No. C—09-2914 SC, 2009 U.S. Dist. LEXIS 91335, 2009 WL 2984722, at *2-3 (N.D. Cal. Sept.15, 2009) (finding that a complaint asserting claims "only on behalf of California purchasers" and "only of behalf of California residents" led to the conclusion that the home state exception was satisfied); *Romo v. Panda Rest. Grp., Inc.*, No. CV 12-00996 GAF OPX, 2012 U.S. Dist. LEXIS 128689, 2012 WL 3930346, at *4 (C.D. Cal. Sept. 7, 2012) (stating "[C]ourts in this Circuit have not shied from making common sense judgments as to the citizenship of purported class members."); *Cortez v. McClatchy Newspapers, Inc.* (E.D.Cal. June 6, 2016, No. 2:15-cv-01891-TLN-EFB) 2016 U.S.Dist.LEXIS 74315, at *17-18 (remanding case and citing to expert declaration establishing, as here, that more than 90 percent of persons living in California still lived in that state in 2014 and concluding that "it is extremely unlikely that at least one third of [Defendant's] newspaper subscribers who subscribed to papers while California residents no longer reside within California.")

As Defendant has not met its burden to demonstrate the existence of federal jurisdiction (and, as far as we know, cannot meet that burden), Plaintiff intends to move to remand. If he succeeds, he will be entitled under 28 U.S.C. § 1447(c) to recover attorneys' fees incurred in connection with the remand motion.  *See Moore v. Permanente Medical Group, Inc.*, 981 F.2d

REDACTED

Hunter Eley, Esq., *et al.*
April 19, 2019
Page 4


443, 446 (9th Cir. 1992); *Balcorta v. Twentieth Century Fox Film Corp.*, 208 F.3d 1102, 1106, n.2 (9th Cir. 2000).

We therefore ask you to stipulate to remand, so that motion practice is not necessary. Please let me know by April 24 at 12:00 p.m. whether your clients will agree to do so. If you have additional evidence or authority to support your removal (such as information about the citizenship of putative class members) please let me know by then.

Finally, please contact me if you have any questions or if you would like to further discuss this issue.

Sincerely,

Seth Safier, Esq.

# Exhibit E

REDACTED

# Exhibit F

**PMK DEPOSITION OF HP, INC. - GARISH NAIR - 03/13/2019**

**LOUIS HICKS vs. HP, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



## Page 1

(1)        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
(2)          IN AND FOR THE COUNTY OF SANTA CLARA
(3)
(4)
(5)  LOUIS HICKS, an individual,
     on behalf of himself, the
(6)  general public, and those
     similarly situated,
(7)
              Plaintiff,
(8)
     v.                        No.  17CV317178
(9)
     HP, INC.,
(10)
              Defendant.
(11) _____/
(12) Person Most Knowledgeable
(13)  Deposition of HP, Inc.
(14)     GARISH NAIR
(15) Wednesday, March 13, 2019
(16)
(17)
(18)
(19)
(20) REPORTED BY:  CINDY TUGAW, CSR #4805
(21)
(22)
              NOGARA REPORTING SERVICE
(23)          5 Third Street, Suite 415
           San Francisco, California 94103
(24)             (415) 398-1889
(25)

## Page 2

(1)                I N D E X
(2)                              Page Number
(3)    EXAMINATION BY MR. SAFIER          5
(4)    EXAMINATION BY MR. SAFIER (Resumed) 104
(5)              ---o0o---
(6)         E X H I B I T S
(7)  Plaintiff's
(8)  Exhibit 29    Copy of a laptop model      77
                   label
(9)
     Exhibit 30    Web pages entitled          80
(10)               "Finding your Product
                   Name, Product number,
(11)               or Serial number"
(12) Exhibit 31    Web pages entitled "HP      83
                   PCs, Printers - Finding
(13)               the Serial Number"
(14) Exhibit 32    Web pages entitled          87
                   "Register your Product"
(15)
     Exhibit 33    Global Newton document      106
(16)
     Exhibit 34    Web pages entitled          158
(17)               "Welcome to HP Customer
                   Support"
(18)
              ---o0o---
(19)
            Marked Questions
(20)
             Page/Line
(21)
              43/25
(22)
              ---o0o---
(23)
(24)
(25)

## Page 3

(1)        BE IT REMEMBERED that, pursuant to Notice
(2)  of Taking Deposition and on Wednesday, the 13th day
(3)  of March, 2019, commencing at the hour of 9:57
(4)  o'clock a.m. thereof, at Nogara Reporting Service,
(5)  5 Third Street, 2nd floor conference room, San
(6)  Francisco, California, before me, CINDY TUGAW, a
(7)  Certified Shorthand Reporter in the State of
(8)  California, personally appeared,
(9)              GARISH NAIR,
(10) called as a witness by the Plaintiff, having been
(11) by me first duly sworn, was examined and testified
(12) as hereinafter set forth.
(13)           ---o0o---
(14)      APPEARANCES OF COUNSEL
(15) For the Plaintiff
        GUTRIDE SAFIER, LLP
(16)    100 Pine Street, Suite 1250
        San Francisco, California 94111
(17)    BY:  SETH A. SAFIER, Attorney at Law
        (415) 639-9090
(18)
(19)
     For the Defendant
(20)    DOLL AMIR ELEY
        1888 Century Park East, Suite 1850
(21)    Los Angeles, CA 90067
        BY:  HUNTER R. ELEY, Attorney at Law
(22)    (310) 557-9100
(23) Also Present:  Hector Aldana, Videographer
(24)           ---o0o---
(25)

## Page 4

(1)      **VIDEO OPERATOR:**  Good morning.  My name is
(2)  Hector Aldana.  I will be the videographer today.
(3)  This is the beginning of the videotaped deposition
(4)  of HP, Inc., in the case of Hicks versus HP, Inc.,
(5)  Case No. 17CV317178 pending in the Santa Clara
(6)  Superior Court.  The deposition is being taken
(7)  pursuant to Section 2025.230 of the CCP.
(8)      The witness name is Garish Nair.  Today is
(9)  March 13, 2019.  The time is 9:58 a.m.  The
(10) deposition is taking place at 5 Third Street, San
(11) Francisco, California.  My company name is Film
(12) Crew SF.  My business address is 222 Columbus
(13) Avenue, No. 402, San Francisco, California 94133.
(14)      The original video of this deposition will
(15) be maintained by the plaintiff's counsel, Gutride
(16) Safier, LLP, 100 Pine Street, No. 1250, San
(17) Francisco, California 94111.
(18)      Would counsel please introduce themselves.
(19)      **MR. SAFIER:**  Good morning.  My name is Seth
(20) Safier.  I represent the plaintiff and the punitive
(21) class.
(22)      **MR. ELEY:**  And I am Hunter Eley, E-l-e-y,
(23) appearing on behalf of Defendant HP, Inc.  And with
(24) me today is Garish Nair, G-i-r-i-s-h N-a-i-r.
(25)      **MR. SAFIER:**  Madam Court Reporter, can you

**Page 5**

(1)  please swear the witness.
(2)        (Whereupon, the Witness was duly sworn by
(3)        the Reporter.)
(4)        EXAMINATION BY MR. SAFIER
(5)  **MR. SAFIER: Q.**  Good morning.
(6)  **A.**  Good morning, sir.
(7)  **Q.**  Like I previously stated, my name is Seth
(8)  Safier.  I represent the plaintiff in this case and
(9)  also seek to represent a class of those similarly
(10)  situated to the plaintiff in this case.
(11)        Can you state, pronounce and spell your
(12)  name, please.
(13)  **A.**  Girish, G-i-r-i-s-h.  The last name is
(14)  Nair, N-a-i-r.
(15)  **Q.**  Nair?
(16)  **A.**  Yes.
(17)  **Q.**  Good morning, Mr. Nair.  Have you ever
(18)  been deposed before?
(19)  **A.**  No.
(20)  **Q.**  Do you understand that you're under oath?
(21)  **A.**  Yes.
(22)  **Q.**  Do you further understand that your
(23)  testimony, even though given informally in this
(24)  conference room, has the same force and effect as
(25)  if given in a court of law?

**Page 6**

(1)  **A.**  Yes.
(2)  **Q.**  Do you understand that my questions and
(3)  your answers will be taken down by the court
(4)  reporter and written into a booklet and may be read
(5)  to the jury at the trial of this case?
(6)  **A.**  Yes.
(7)  **Q.**  Do you understand that you'll be given an
(8)  opportunity to read this deposition transcript and
(9)  make any changes in the form or substance of any
(10)  question or answer?
(11)  **A.**  Yes.
(12)  **Q.**  You further understand, however, if you do
(13)  make any substantive changes, I have the
(14)  opportunity to comment on these changes at trial,
(15)  and this may prove to be an issue, so it is
(16)  important that you provide your best, most honest,
(17)  most accurate testimony as possible.
(18)        Is that acceptable?
(19)  **A.**  Yes, sir.
(20)  **Q.**  If you do not understand a question, I ask
(21)  you to tell me.  If you don't tell me, I will
(22)  assume you understood it as asked.  Okay?
(23)  **A.**  (Witness indicates affirmatively.)
(24)        Yes, sir.
(25)  **Q.**  I just saw you nod your head.  That's an

**Page 7**

(1)  important ground rule here.  The court reporter
(2)  only transcribes audible answers.  Shakes of the
(3)  heads, nods, they're fine, but when it's time for
(4)  you to answer a question, you need to give it
(5)  audibly.
(6)        Is that acceptable?
(7)  **A.**  Yes, sir.
(8)  **Q.**  I'll do my best to -- to try to catch you
(9)  if you mess up.  Okay?
(10)  **A.**  Yes.
(11)  **Q.**  The next kind of ground rule is that in
(12)  normal, everyday conversation we have a tendency to
(13)  know what the person is asking, cut them off or,
(14)  you know, ask a clarifying question in the middle
(15)  of a question or something like that.  But it's
(16)  very important that you let me finish my question,
(17)  give your attorney the opportunity to object if he
(18)  has any objections, and then provide your answers.
(19)  The same is true of me; I need to wait until your
(20)  answer is complete before I ask the next question.
(21)        Is that acceptable?
(22)  **A.**  Yes.
(23)  **Q.**  Your attorney may provide objections.
(24)  Unless he instructs you not to answer, I'm still
(25)  entitled to an answer.

**Page 8**

(1)        Is that acceptable?
(2)  **A.**  Yes.
(3)  **Q.**  If you need a break at any time to go to
(4)  the bathroom, you just want to collect yourself,
(5)  that's fine.  No problem.  It's not an endurance
(6)  test today.  I just ask that you either give me a
(7)  little notice, or if you need a break, don't ask
(8)  for one while there's a question pending.  Let me
(9)  finish up that question.  And even better, if you
(10)  can give me a little notice and allow me to finish
(11)  up a line of questioning, that would be greatly
(12)  appreciated.  Okay?
(13)  **A.**  Yes.
(14)  **Q.**  Has your attorney explained to you the
(15)  nature of these proceedings and the importance of
(16)  giving honest, accurate answers?
(17)  **A.**  Yes.
(18)  **Q.**  Any reason you feel you cannot proceed
(19)  with this deposition at this time?
(20)  **A.**  No.
(21)  **Q.**  Who do you work for?
(22)  **A.**  HP, Inc.
(23)  **Q.**  Where is your office?
(24)  **A.**  I'm from Houston, so my office is in
(25)  Houston.

**Page 9**

(1)    **Q.**  For how long have you worked for HP, Inc.?

(2)    **A.**  From 2006, June 10th, onwards.

(3)    **Q.**  June 10th, 2006?

(4)    **A.**  Yes, sir.

(5)    **Q.**  Just to be precise.  Where did you work

(6) prior to June 10th, 2006?

(7)    **A.**  A company named Infogain Corporation.

(8)    **Q.**  When you were hired by HP, Inc., on June

(9) 10, 2006, what was your job title?

(10)    **A.**  Solution architect.

(11)    **Q.**  Solution architect.  What are the job --

(12) what is the job description of a solution architect

(13) at HP?

(14)    **A.**  Architecting software applications for

(15) organizations' CSS, customer service and support.

(16)    **Q.**  For how long did you have that title; that

(17) is, how long were you a solution architect at HP,

(18) Inc.?

(19)    **A.**  Until 2011.

(20)    **Q.**  And in 2011, what did your title change

(21) to?

(22)    **A.**  To program manager.

(23)    **Q.**  What program did you manage?

(24)    **A.**  Multiple programs.

(25)    **Q.**  So you're a programs manager, right?

**Page 10**

(1)    **A.**  Yeah.

(2)    **Q.**  So what programs did you manage beginning

(3) in --

(4)    **A.**  The title says it's programs manager.  So

(5) it's not like programs manager.  Title is programs

(6) manager, sir.

(7)    **Q.**  Okay.  What programs did you manage

(8) beginning in 2011?

(9)    **A.**  For the past seven years many, many

(10) programs.  Do you want the name of the programs?

(11)    **Q.**  Please.

(12)    **A.**  Master data, and customer consumer --

(13) consumer customer registration, and big data

(14) analytics.

(15)    **Q.**  Any other programs?

(16)    **A.**  No.

(17)    **Q.**  Were your CSS responsibilities still

(18) encumbered in this new job title?

(19)    **A.**  Yes, sir.

(20)    **Q.**  And is program manager your current title?

(21)    **A.**  Yes, sir.

(22)    **Q.**  You previously said that you're a solution

(23) architect for CSS, which was customer service and

(24) support, is that correct?

(25)    **A.**  Yes, sir.

**Page 11**

(1)    **Q.**  And what is included in CSS?

(2)    **A.**  All customer support and systems

(3) applications.

(4)    **Q.**  When you say "applications" --

(5)    **A.**  Systems.

(6)    **Q.**  Systems.  When you say "applications," you

(7) mean software applications?

(8)    **A.**  Yes, sir.

(9)    **Q.**  And what were the specific names of those

(10) software applications that were included in the

(11) CSS?

(12)    **A.**  An application called iSAC, i-S-A-C.  Do

(13) you want the full name or just --

(14)    **Q.**  That's fine.

(15)    **A.**  There's another application called CDAX,

(16) C-D-A-X, and another application called A&R.  A&R.

(17) That's it.

(18)    **Q.**  Okay.  Starting with iSAC, what is -- what

(19) was the iSAC application?

(20)    **A.**  iSAC application is the system of record

(21) for all customer and product registrations.

(22)    **Q.**  Is that iSAC system still in place today

(23) at HP?

(24)    **A.**  Yes, sir.

(25)    **Q.**  In lay terms, as I understand it, the iSAC

**Page 12**

(1) system kept track of all customer and product

(2) registrations for -- well, strike that.

(3)         When you said the application was for all

(4) customer and product registrations, was that for HP

(5) products?

(6)    **A.**  Yes.

(7)    **Q.**  All HP products?

(8)    **A.**  You can register all, but it depends on

(9) the customer, whether they register or not.

(10)    **Q.**  Fair enough.  But all products that were

(11) actually registered --

(12)    **A.**  Yes.

(13)    **Q.**  -- included laptops, printers, any HP --

(14)    **A.**  Everything.

(15)    **Q.**  You have to let me finish.

(16)    **A.**  Sorry.

(17)    **Q.**  No problem.  It happens.  Trust me, it

(18) happens to all of us.

(19)         Assuming a customer registered a product,

(20) the iSAC system would include all HP products, is

(21) that correct?

(22)    **A.**  Yes.

(23)    **Q.**  And that would include all products sold

(24) across United States?

(25)    **A.**  Yes.

**Page 53**

(1) least one contact address, and that they purchased
(2) that computer, is that correct?
(3)    **A.** Not exactly.
(4)    **Q.** Why not?
(5)    **A.** Because HP requires one contact method.
(6) So some people give email addresses. Some people
(7) give telephone numbers. Some people give
(8) addresses. So it is not mandatory to register --
(9) for registration to have all these. Any one is
(10) fine.
(11)    **Q.** Okay. But at a minimum, HP would at least
(12) have one contact -- piece of contact information
(13) for all such purchases, correct?
(14)    **A.** Yes, sir.
(15)    **Q.** So it may not have address and email
(16) address, but it would have one or the other.
(17)    Isn't it true that email address is
(18) mandatory?
(19)    **A.** Not necessarily.
(20)    **Q.** No? Isn't it true that a physical address
(21) is mandatory?
(22)    **A.** Not necessarily.
(23)    **Q.** How could they make a purchase without
(24) providing a physical address?
(25)    **A.** Only if they come to the store.

**Page 54**

(1)    **Q.** What store?
(2)    **A.** Store.hp.com.
(3)    **Q.** I'm not -- I'm not following your
(4) testimony.
(5)    In other words, if they're purchasing on
(6) some -- online, if they don't have a physical
(7) address for you to ship the computer, how do you
(8) know where to send it?
(9)    **A.** I was talking about iSAC. When they buy
(10) it online, they have to give an address for us to
(11) ship.
(12)    **Q.** Oh. So HP maintains that address in some
(13) other database?
(14)    **A.** Store.hp.com.
(15)    **Q.** Store.hp.com. So is it possible to
(16) cross-reference information in iSAC with
(17) information that's stored in store.hp.com?
(18)    **A.** Yes.
(19)    **Q.** So by cross-referencing it, for every
(20) person that purchased a computer on Exhibit 2 after
(21) October of 2013, HP could identify that person and
(22) also know their contact information; at a minimum,
(23) their name and at least one location for contact,
(24) whether that be email or a physical address or
(25) telephone number, correct?

**Page 55**

(1)    **MR. ELEY:** Objection. Compound. Assumes
(2) facts not in evidence.
(3)    May I have the question read back, please.
(4)    (Record read by Reporter.)
(5)    **MR. ELEY:** Do you have the question in mind?
(6)    **THE WITNESS:** Yes, I do.
(7)    **MR. ELEY:** Okay.
(8)    **THE WITNESS:** Because I didn't hear the word
(9) "store." Do you mean that the things you're
(10) talking about the customer has bought it from our
(11) stores?
(12)    **MR. SAFIER:** Correct.
(13)    **THE WITNESS:** Then we can.
(14)    **MR. SAFIER: Q.** So -- and -- and, actually,
(15) my question can be sharpened some. You actually --
(16) by cross-referencing the information in
(17) store.hp.com, you necessarily know more about such
(18) persons. That is, persons who, after October of
(19) 2013 through the present, purchased any computer
(20) listed on Exhibit 2 at store.hp.com, you know all
(21) the information for them. You know their name.
(22) You know their at least one address. You know
(23) their phone number, too, correct?
(24)    **A.** (Indicates affirmatively.)
(25)    **Q.** You know their email address, correct?

**Page 56**

(1)    **A.** Yes.
(2)    **Q.** You know the product that they purchased,
(3) correct?
(4)    **A.** Correct.
(5)    **Q.** You know the purchase date, correct?
(6)    **A.** Correct.
(7)    **Q.** You know the purchase price?
(8)    **A.** Correct.
(9)    **Q.** You know if they've had any warranty
(10) service done on that product, correct?
(11)    **A.** Correct.
(12)    **Q.** You know if they've made any service
(13) inquiry regarding that contact irrespective of how
(14) that was done, whether it was phone, whether it was
(15) email, whether it was a Web form or chat, correct?
(16)    **A.** Correct.
(17)    **Q.** Approximately what percentage of computers
(18) does HP sell at -- laptop computers at the
(19) hp.store.com?
(20)    **A.** I don't know that.
(21)    **Q.** Who would you ask to find out that
(22) information?
(23)    **A.** I don't know.
(24)    **Q.** Take a look at Exhibit 1.
(25)    **MR. ELEY:** Seth, before we do, we've been

Page 57

(1) going for about an hour and ten minutes. Can we
(2) take a short break?
(3)    MR. SAFIER: Sure. Absolutely. Good time.
(4)    VIDEO OPERATOR: Going off the record 11:08
(5) a.m.
(6)    (Brief recess.)
(7)    VIDEO OPERATOR: Going back on the record
(8) 11:24 a.m.
(9)    MR. SAFIER: Q. Welcome back.
(10)    A. Thank you, sir.
(11)    Q. You understand you're still under oath?
(12)    A. Yes, sir.
(13)    Q. So we've had a request from the court
(14) reporter that both of us slow down. So let's do
(15) our best to do that. Okay?
(16)    Take a look at Exhibit 1, please, topic
(17) 12. Do you see that?
(18)    MR. ELEY: So flip to page 6.
(19)    THE WITNESS: Oh, sorry.
(20)    MR. SAFIER: Q. So that topic seeks "the
(21) number of, and possible methods for identifying,
(22) members of the proposed class as set forth in
(23) paragraph 51 of the complaint."
(24)    Do you see that?
(25)    A. Yes, sir.

Page 58

(1)    Q. Did you look at the proposed class that's
(2) set forth in paragraph 51 of the complaint?
(3)    A. Yes, I did.
(4)    Q. I'm going to tweak that slightly so we
(5) have a better understanding of what we're talking
(6) about when we -- I ask questions about that. Okay?
(7)    A. (Indicates affirmatively.)
(8)    Q. When I say "the proposed class," I want
(9) all persons who purchased any laptop identified on
(10) Exhibit 2 while residing in California between
(11) October 10, 2013, and the present.
(12)    Is that acceptable?
(13)    A. Yes.
(14)    Q. If HP was ordered to do its best to
(15) identify such persons using its data applications
(16) and system, how would it go about doing so?
(17)    MR. ELEY: Do you want to have the definition
(18) read back?
(19)    THE WITNESS: Yes.
(20)    MR. ELEY: Could you read back the definition
(21) of the proposed class.
(22)    (Record read by Reporter.)
(23)    THE WITNESS: Yes.
(24)    MR. SAFIER: Q. How would HP go about
(25) identifying such persons?

Page 59

(1)    A. I explained that to you before, also, that
(2) we can only identify the customers when they come
(3) and buy from our store. That's the prime thing.
(4) If they come and buy from our store, we can
(5) identify them. It's California. We can easily
(6) find out. But if they buy from somewhere else,
(7) unless they register it, we won't be able to
(8) identify them.
(9)    Q. Okay. So as I understand your testimony,
(10) such persons are easily identified by HP data if
(11) they purchase at the HP online store, correct?
(12)    A. Yes.
(13)    Q. As I understand your testimony, they're
(14) also easily identified if a person in that class
(15) registered with HP, correct?
(16)    A. Correct.
(17)    Q. Registered that specific product with HP,
(18) correct?
(19)    A. Correct.
(20)    Q. So for those two buckets, online purchases
(21) and people that registered the product, assuming it
(22) was a product on Exhibit 2 during that date, HP
(23) would know if they registered or it or they
(24) purchased it on the HP website, correct?
(25)    A. Correct.

Page 60

(1)    Q. Using HP's data, correct?
(2)    A. Correct.
(3)    Q. Then there's some missing percentage of
(4) people that didn't purchase from the website, HP
(5) website, and didn't register the product, correct?
(6)    A. Correct.
(7)    Q. How would HP go about figuring out how to
(8) identify that missing group?
(9)    A. I don't know.
(10)    Q. Let's say somebody called in for warranty
(11) service.
(12)    A. Correct.
(13)    Q. What type of information would be
(14) collected from that person?
(15)    A. Just personal details like name and number
(16) and contact and all those things, plus the product.
(17)    Q. If HP knew the product that was purchased,
(18) would it also know the approximate purchase date?
(19)    A. Yes.
(20)    Q. So for those people that called in for
(21) warranty service, irrespective of whether or not
(22) they registered the product or purchased it on HP
(23) store, if HP searched that data repository -- I
(24) believe you called it the CDAX system -- it could
(25) identify such persons, too, correct?

Page 61

(1)   **A.** Correct.

(2)   **Q.** So we're now narrowing the group of people

(3)   that HP -- within the class that we defined that HP

(4)   cannot identify to those persons who did not

(5)   purchase on hpstore.com, did not register their

(6)   product, and did not call in at some point for

(7)   service, correct?

(8)   **A.** Correct.

(9)   **Q.** As you sit here today, does HP have any

(10)  reason to believe that those persons -- if, let's

(11)  say, they received some notice in the paper saying,

(12)  hey, you may be a member of this class, you need to

(13)  determine if you purchased one of the products on

(14)  Exhibit 2 after October 10 of 2013, say, while you

(15)  were a resident in California, wouldn't those

(16)  people be able to self-identify?

(17)      **MR. ELEY:** Objection. Calls for speculation.

(18)  Calls for a legal conclusion.

(19)      **THE WITNESS:** I don't know, really.

(20)      **MR. SAFIER: Q.** Do you have any reason to

(21)  believe that they wouldn't be able to determine if

(22)  they had purchased a product during that certain

(23)  time frame that was included on Exhibit 2?

(24)      **MR. ELEY:** Same objections. Asked and

(25)  answered.

Page 62

(1)      **THE WITNESS:** Same answer. I don't know.

(2)      **MR. SAFIER: Q.** I know. I appreciate that

(3)   you don't know. But I want to know a little bit

(4)   different question. I want to know if, as you sit

(5)   here today, HP has any reason to believe that such

(6)   persons do not self-identify.

(7)      **MR. ELEY:** Asked and answered.

(8)      **THE WITNESS:** I don't know.

(9)      **MR. SAFIER: Q.** I know you don't know. But I

(10)  want to know if you have any reason to believe that

(11)  it could not be done by those persons. In other

(12)  words, they couldn't look at this and say, oh, I

(13)  bought one of those products.

(14)      **MR. ELEY:** Same objections. Asked and

(15)  answered.

(16)      **THE WITNESS:** I -- I don't know.

(17)      **MR. SAFIER: Q.** Maybe we'll try to get to

(18)  that question later because it doesn't seem you

(19)  want to answer it.

(20)      So backing up to our testimony -- to your

(21)  testimony, not our testimony, we identified three

(22)  different repositories of information that -- where

(23)  we can check to find out who was the member of the

(24)  class that we previously identified.

(25)      We identified the information that is

Page 63

(1)   existing hpstore.com. We identified information

(2)   that would be resident in CDAX and information that

(3)   would be resident in iSAC. Correct?

(4)   **A.** Correct.

(5)   **Q.** Can that -- all of those systems could be

(6)   searched using, I think you testified, normal

(7)   search logic, including Boolean logic, to provide a

(8)   data output that includes all the persons in that

(9)   class of persons that we previously discussed,

(10)  correct?

(11)  **A.** Correct.

(12)  **Q.** And in order -- just thinking about

(13)  that -- that -- that class, we would need to know

(14)  that person's name, correct?

(15)  **A.** Correct.

(16)  **Q.** That person's -- some piece of contact

(17)  information for that person, correct?

(18)  **A.** Correct.

(19)  **Q.** It wouldn't necessarily have to be

(20)  address, physical address, correct?

(21)  **A.** Correct.

(22)  **Q.** But it's possible that it could be

(23)  physical address, correct?

(24)  **A.** Correct.

(25)  **Q.** Instead, it could be telephone, correct?

Page 64

(1)   **A.** Correct.

(2)   **Q.** Or email address, correct?

(3)   **A.** Correct.

(4)   **Q.** And we would need to know what product was

(5)   purchased, correct?

(6)   **A.** Correct.

(7)   **Q.** And the purchase date, right?

(8)   **A.** Correct.

(9)   **Q.** So by virtue of the purchase date, we

(10)  would know that it fit within that certain time

(11)  frame, correct?

(12)  **A.** Correct.

(13)  **Q.** And by virtue of the product that was

(14)  purchased, we would know whether it was one of the

(15)  products that is listed on Exhibit 2, correct?

(16)  **A.** Correct.

(17)  **Q.** Obviously there will be -- because the

(18)  time frame of between when Exhibit 2 was prepared

(19)  and the present, there's a gap. There may be new

(20)  products. We would need to update Exhibit 2 to be

(21)  more precise, correct?

(22)      **MR. ELEY:** Objection. Calls for speculation.

(23)  Also outside the scope of testimony for which he's

(24)  been designated as HP's representative.

(25)      **THE WITNESS:** Honestly, I don't know the

**Page 65**

(1) answer.

(2)     **MR. SAFIER:** Q. I want only honest answers.
(3) So I'm going to assume, when you answer, that
(4) you're answering honestly.

(5)     Do you have, as you sit here today, any
(6) idea of the percentage of sales of HP laptops, the
(7) ones on Exhibit 2, where the person did not
(8) purchase at the HP store, did not register the
(9) product, and did not, at some point after their
(10) purchase, call in for customer support?

(11)     Do you have any idea what percentage that
(12) is?

(13)     A. No.

(14)     Q. Do you have any reason to believe that
(15) it's more than ten percent of HP laptop --

(16)     A. I don't -- I don't know.

(17)     Q. You have to let me finish.

(18)     Do you have any reason to believe that
(19) it's more -- anything more than 10 percent of all
(20) purchases of laptops on Exhibit 2?

(21)     A. No, I don't know.

(22)     Q. Do you have any reason to believe that
(23) it's more than five percent?

(24)     A. I don't know.

(25)     Q. So you don't know one way or the other.

**Page 66**

(1)     A. No.

(2)     Q. If I asked you to guess, your best guess,
(3) what would you guess?

(4)     A. I don't know because -- I can tell you
(5) that -- for the same reason, because we don't have
(6) the sales registration, and I can't even guess.

(7)     Q. I understand completely that you cannot
(8) give me a perfect number, but that doesn't mean you
(9) can't give me an educated guess. A technical guy
(10) such as yourself, you can't give me an educated
(11) guess?

(12)     MR. ELEY: Objection. Asked and answered.
(13) Argumentative. Compound.

(14)     THE WITNESS: I -- I don't want to give you a
(15) wrong number.

(16)     MR. SAFIER: Q. I'm not asking for a right or
(17) wrong number. I'm just asking for your best
(18) estimate.

(19)     MR. ELEY: Objection. Asked and answered.

(20)     MR. SAFIER: Q. You can't do it?

(21)     A. No.

(22)     Q. We know for sure that it's not a hundred
(23) percent, though, right?

(24)     A. That is correct.

(25)     Q. And we also know for sure it's not zero

**Page 67**

(1) percent, correct?

(2)     A. That is correct.

(3)     Q. Because we know that there's been at least
(4) one person that purchased on the Web store,
(5) correct?

(6)     A. Correct.

(7)     Q. Because if there wasn't, you guys wouldn't
(8) be in business.

(9)     A. Correct.

(10)     Q. Fair enough.

(11)     There are other ways that those people
(12) could be identified. The missing group of people,
(13) people that didn't register, people that didn't buy
(14) on hp.com and people that didn't call in for
(15) customer support.

(16)     There are other ways that they can be
(17) identified, though, right?

(18)     MR. ELEY: Objection. Calls for speculation.
(19) Incomplete hypothetical. Lacks foundation.

(20)     THE WITNESS: Actually, no.

(21)     MR. SAFIER: Q. Why not?

(22)     A. Because we do not know.

(23)     Q. I'm not talking about HP, but they could
(24) be identified by -- for example, if they purchased
(25) at Best Buy, Best Buy may have their name, contact

**Page 68**

(1) information, product purchased, and purchase date,
(2) correct?

(3)     MR. ELEY: Objection. Calls for speculation.
(4) Lacks foundation. Also outside the scope of this
(5) witness' designated testimony.

(6)     THE WITNESS: I don't know what Best Buy's
(7) stores -- I don't know what Best Buy stores of
(8) customer. I have no idea of that at all.

(9)     MR. SAFIER: Q. But it's possible, correct?

(10)     MR. ELEY: Objection. Asked and answered.

(11)     MR. SAFIER: Q. It's possible that Best Buy
(12) stores all that information, correct?

(13)     MR. ELEY: Objection. Calls for speculation.
(14) Outside the scope of this witness' designated
(15) testimony. Lacks foundation.

(16)     THE WITNESS: I have no idea, sir, honestly.

(17)     MR. SAFIER: Q. I'm not asking you if you
(18) have an idea whether they do it or not. I'm just
(19) asking if it's possible or not.

(20)     A. I don't know.

(21)     Q. How about Amazon? Do you know -- you're
(22) going to testify that you don't know whether Amazon
(23) keeps that information, but I want to know --
(24) Amazon and any number of other HP partners could
(25) maintain the exact type of information that's